**FILED**

OCT 2 2 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1  McGREGOR W. SCOTT
   United States Attorney
2  ANDRÉ M. ESPINOSA
   KEVIN KHASIGIAN
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5

6  Attorneys for Plaintiff
   United States of America
7

8            IN THE UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,              CASE NO. 2:19-cR-182-JAM

12                   Plaintiff,            PLEA AGREEMENT

13           v.                            DATE:   OCTOBER 22, 2019
                                           TIME:   9:15A.M.
14  JOSEPH W. BAYLISS,                     COURT:  HON. JOHN A. MENDEZ

15                   Defendant.

16

17                  **I.    INTRODUCTION**

18      **A.   Scope of Agreement.**

19          The Information in this case charges the defendant with violation of Title 18, United States

20  Code, Section 371—Conspiracy to Commit an Offense Against the United States. This document

21  contains the complete plea agreement between the United States Attorney's Office for the Eastern

22  District of California (the "government") and the defendant regarding this case. This Plea Agreement is

23  limited to the United States Attorney's Office for the Eastern District of California and cannot bind any

24  other federal, state, or local prosecuting, administrative, or regulatory authorities.

25      **B.   Court Not a Party.**

26          The Court is not a party to this Plea Agreement. Sentencing is a matter solely within the

27  discretion of the Court, and the Court may take into consideration any and all facts and circumstances

28  concerning the criminal activities of the defendant, including activities which may not have been

    PLEA AGREEMENT                    1

charged in the Information.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this Plea Agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this Plea Agreement.  The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.     DEFENDANT'S OBLIGATIONS

### A.     Guilty Plea.

The defendant will plead guilty to violating Title 18, United States Code, Section 371— Conspiracy to Commit an Offense Against the United States ("Count One").  The defendant agrees that he is in fact guilty of this charge and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this Plea Agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

### 1.     Waiver of Indictment.

The defendant acknowledges that under the United States Constitution he is entitled to be indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim. P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of Indictment to the charges set forth in the Information.  The defendant agrees that at a time set by the Court, he will sign a

PLEA AGREEMENT                          2

1  written waiver of prosecution by Indictment and consent to proceed by Information rather than by
2  Indictment.

3          **B.      Restitution.**

4          The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of
5  certain offenses. The defendant agrees that his conduct is governed by the Mandatory Restitution Act
6  pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims
7  affected by this offense, including, but not limited to, the victims covered in the factual basis, victims
8  covered in those counts to be dismissed as part of the Plea Agreement pursuant to 18 U.S.C. §
9  3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the
10  periods through in or about January 2014 and in or about December 2018. The amount of restitution
11  will be between approximately $380 million and $523 million.

12         Restitution payments shall be by cashier's or certified check made payable to the Clerk of the
13  Court.

14         The defendant further agrees that he will not seek to discharge any restitution obligation or any
15  part of such obligation in any bankruptcy proceeding.

16         **C.      Fine.**

17         The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a
18  fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively
19  prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury
20  to the Probation Officer and the government in advance of the issuance of the draft Presentence
21  Investigation Report, along with supporting documentation. The government retains the right to oppose
22  the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered
23  by the Court, up to the statutory maximum fine for the defendant's offense.

24         **D.      Special Assessment.**

25         The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering
26  a check or money order payable to the United States District Court to the United States Probation Office
27  immediately before the sentencing hearing. The defendant understands that this Plea Agreement is
28  voidable at the option of the government if he fails to pay the assessment prior to that hearing.

PLEA AGREEMENT                                 3

1    **E.    Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

2        If the defendant, cooperating or not, violates this Plea Agreement in any way, withdraws his

3    plea, or tries to withdraw his plea, this Plea Agreement is voidable at the option of the government. If

4    the government elects to void the Agreement based on the defendant's violation, the government will no

5    longer be bound by its representations to the defendant concerning the limits on criminal prosecution

6    and sentencing as set forth herein. A defendant violates this Plea Agreement by committing any crime

7    or providing or procuring any statement or testimony which is knowingly false, misleading, or

8    materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea

9    conduct constituting obstruction of justice. Varying from stipulated Guidelines application or

10    agreements regarding arguments as to 18, United States Code, section 3553, as set forth in this

11    Agreement, personally or through counsel, also constitutes a violation of the Plea Agreement. The

12    government also shall have the right (1) to prosecute the defendant on any of the counts to which he

13    pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this Plea Agreement; and

14    (3) to file any new charges that would otherwise be barred by this Plea Agreement. The defendant shall

15    thereafter be subject to prosecution for any federal criminal violation of which the government has

16    knowledge. The decision to pursue any or all of these options is solely in the discretion of the United

17    States Attorney's Office.

18        By signing this Plea Agreement, the defendant agrees to waive any objections, motions, and

19    defenses that the defendant might have to the government's decision. Any prosecutions that are not

20    time-barred by the applicable statute of limitations as of the date of this Plea Agreement may be

21    commenced in accordance with this paragraph, notwithstanding the expiration of the statute of

22    limitations between the signing of this Plea Agreement and the commencement of any such

23    prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect

24    to such counts including, but not limited to, any statutes of limitation or any objections based on the

25    Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-

26    barred as of the date of this Plea Agreement. The determination of whether the defendant has violated

27    the Plea Agreement will be under a probable cause standard.

28        In addition, (1) all statements made by the defendant to the government or other designated law

PLEA AGREEMENT                    4

1   enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

2   whether before or after this Plea Agreement, shall be admissible in evidence in any criminal, civil, or

3   administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

4   claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal

5   Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by

6   the defendant before or after this Plea Agreement, or any leads derived therefrom, should be suppressed.

7   By signing this Plea Agreement, the defendant waives any and all rights in the foregoing respects .

8        **F.    Asset Disclosure.**

9        The defendant agrees to make a full and complete disclosure of his assets and financial

10  condition, and will complete the United States Attorney's Office's "Authorization to Release

11  Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change

12  of plea, including supporting documentation.  The defendant also agrees to have the Court enter an order

13  to that effect.  The defendant understands that if he fails to complete truthfully and provide the described

14  documentation to the United States Attorney's office within the allotted time, he will be considered in

15  violation of the Agreement, and the government shall be entitled to the remedies set forth in section II.E

16  above, above.

17       **G.    Agreement to Cooperate.**

18       The defendant agrees to cooperate fully with the government and any other federal, state, or local

19  law enforcement agency, as directed by the government.  As used in this Pea Agreement, "cooperation"

20  requires the defendant:  (1) to respond truthfully and completely to all questions, whether in interviews,

21  in correspondence, telephone conversations, before a grand jury, or at any trial or other court

22  proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the

23  defendant's presence is requested by the government or compelled by subpoena or court order; (3) to

24  produce voluntarily any and all documents, records, or other tangible evidence requested by the

25  government; (4) not to participate in any criminal activity while cooperating with the government; and

26  (5) to disclose to the government the existence and status of all money, property, or assets, of any kind,

27  derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal

28  activities or the illegal activities of any conspirators.

1

## III.    THE GOVERNMENT'S OBLIGATIONS

2

### A.    Dismissals/Other Charges.

3       The government agrees not to bring any other charges arising from the conduct outlined in the

4   Factual Basis attached hereto as Exhibit A. The government also agrees not to reinstate any dismissed

5   count except if this Agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation

6   of Plea Agreement by Defendant/Withdrawal of Plea(s)), III.B.3 (Reduction of Sentence for

7   Cooperation), VI.B (Estimated Guideline Calculation), and VII.B (Waiver of Appeal and Collateral

8   Attack) herein.

9

### B.    Recommendations.

10          1.    Incarceration Range.

11      The government will recommend that the defendant be sentenced to the low end of the

12   applicable guideline range as determined by the Court.

13          2.    Acceptance of Responsibility.

14      The government will recommend a two-level reduction (if the offense level is less than 16) or a

15   three-level reduction (if the offense level reaches 16) in the computation of his offense level if the

16   defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. §

17   3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of

18   the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging

19   in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

20   preparation of the pre-sentence report or during the sentencing proceeding.

21          3.    Reduction of Sentence for Cooperation.

22      The government agrees to recommend at the time of sentencing that the defendant's sentence of

23   imprisonment be reduced by up to 50% of the applicable guideline sentence if he provides substantial

24   assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that he must

25   comply with paragraphs II.G and not violate this Plea Agreement as set forth in paragraph II.E herein.

26   The defendant understands that it is within the sole and exclusive discretion of the government to

27   determine whether the defendant has provided substantial assistance.

28      The defendant understands that the government may recommend a reduction in his sentence of

PLEA AGREEMENT                    6

1 less than 50% or no reduction at all; depending upon the level of assistance the government determines
2 that the defendant has provided.

3      The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a
4 recommendation and is not binding on the Court, that this Plea Agreement confers no right upon the
5 defendant to require that the government make a § 5K1.1 motion, and that this Plea Agreement confers
6 no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In
7 particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact
8 that the government decides not to recommend a sentence reduction or recommends a sentence
9 reduction less than the defendant thinks is appropriate.

10      If the government determines that the defendant has provided further cooperation within one
11 year following sentencing, the government may move for a further reduction of his sentence pursuant to
12 Rule 35 of the Federal Rules of Criminal Procedure.

13      **C.      Use of Information for Sentencing.**

14      The government is free to provide full and accurate information to the Court and Probation,
15 including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate
16 statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also
17 understands and agrees that nothing in this Plea Agreement bars the government from defending on
18 appeal or collateral review any sentence that the Court may impose.

19      **IV.      ELEMENTS OF THE OFFENSE**

20      At a trial, the government would have to prove beyond a reasonable doubt the following
21 elements of the offense to which the defendant is pleading guilty.

22      **1.      18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States**

23      Although *not* elements of Conspiracy to Commit an Offense Against the United States, in
24 violation of 18 U.S.C. § 371, the elements of the underlying criminal offense (Wire Fraud, in violation
25 of 18 U.S.C. § 1343) are:

26      a.      The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan
               for obtaining money or property by means of false or fraudulent pretenses,
27             representations, or promises;

28      b.      The statements made or facts omitted as part of the scheme were material; that is, they

PLEA AGREEMENT                                7

1    had a natural tendency to influence, or were capable of influencing, a person to part with
     money or property;

2

3    c.    The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

4    d.    The defendant used, or caused to be used, a wire communication to carry out or attempt
           to carry out an essential part of the scheme.

5

6    Thus, to convict the defendant at trial on the charge of Conspiracy to Commit an Offense

7    Against the United States, in violation of 18 U.S.C. § 371, the government would have to prove beyond

8    a reasonable doubt that:

     a.    Beginning at least as early as in or about March 2011, and ending in or about December
9          2018, there was an agreement between two or more people to commit wire fraud as

10         charged in the Information;

11   b.    Second, the defendant became a member of the conspiracy knowing of at least one of its
           objects and intending to help accomplish it; and

12

13   c.    One of the members of the conspiracy performed at least one overt act for the purpose of
           carrying out the conspiracy.

14   The defendant fully understands the nature and elements of the crimes charged in the

15   Information to which he is pleading guilty, together with the possible defenses thereto, and has

16   discussed them with his attorney.

17                    **V.    MAXIMUM SENTENCE**

18   **A.    Maximum Penalty.**

19   The maximum sentence that the Court can impose is 5 years of incarceration, a fine of $250,000,

20   a 3-year period of supervised release and a special assessment of $100. By signing this Plea Agreement,

21   the defendant also agrees that the Court can order the payment of restitution for the full loss caused by

22   the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the

23   amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as

24   noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any

25   restitution imposed by the Court.

26   **B.    Violations of Supervised Release.**

27   The defendant understands that if he violates a condition of supervised release at any time during

28

PLEA AGREEMENT                          8

1   the term of supervised release, the Court may revoke the term of supervised release and require the
2   defendant to serve up to 2 additional years imprisonment.

3   ## VI.    SENTENCING DETERMINATION

4   ### A.    Statutory Authority.

5   The defendant understands that the Court must consult the Federal Sentencing Guidelines and
6   must take them into account when determining a final sentence. The defendant understands that the
7   Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the
8   Sentencing Guidelines and must take them into account when determining a final sentence. The
9   defendant further understands that the Court will consider whether there is a basis for departure from the
10  guideline sentencing range (either above or below the guideline sentencing range) because there exists
11  an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into
12  consideration by the Sentencing Commission in formulating the Guidelines. The defendant further
13  understands that the Court, after consultation and consideration of the Sentencing Guidelines, must
14  impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

15  ### B.    Stipulations Affecting Guideline Calculation.

16  The government and the defendant agree that there is no material dispute as to the following
17  sentencing guidelines variables and therefore stipulate to the following:

18  **1.  Base Offense Level**: The base offense level for the charges to which the defendant is
19  pleading guilty is **6**. See U.S.S.G. § 2B1.1(a)(2).

20  **2.  Specific Offense Characteristics:**

21      a.  Twenty-eight levels are added **(+28)** because the loss attributable to the defendant
22          during the time period of his knowing involvement in the conspiracy and within the
            scope of his knowing involvement exceeded $250,000,000 but is less than
23          $550,000,000. Id. at (b)(1)(O).

24      b.  Two levels are added **(+2)** because the offense involved 10 or more victims. Id. at
25          (b)(2)(A).

26  **3.  Specific Offense Level:** The parties anticipate that the specific offense level will be **36**.

27  **4.  Chapter Three Adjustments**:

28      a.  Two levels are added **(+2)** because the defendant willfully obstructed or impeded, or
            attempted to obstruct or impede, the administration of justice with respect to the

PLEA AGREEMENT                              9

1   investigation of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct. U.S.S.G. § 3C1.1.

  b.   Three levels are subtracted **(-3)** if the defendant pleads guilty, accepts responsibility for his offense, and the Specific Offense Level is above 16. U.S.S.G. § 3E1.1; <u>see also</u> Part III.B.2 above.

5   **5.   Adjusted Offense Level:** Given the stipulations above, the parties anticipate that the

6 adjusted offense level will be **35**.

7    **6.   Criminal History:** The parties agree and stipulate that the applicable criminal history

8 will be determined by the Court's probation officers. The parties estimate but do not stipulate that the

9 defendant's criminal history category will be I, and that the Guidelines sentencing range will be no

10 less than **168 to 210** months in prison, subject, however, to the maximum possible sentence for his

11 offense of conviction. The defendant understands that if his criminal history category differs from the

12 parties' estimate, his Guidelines sentencing range may differ from that set forth here.

13    **C.   <u>Departures or Other Enhancements or Reductions.</u>**

14     The parties agree that they will not seek or argue in support of any other specific offense

15 characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"),

16 or cross-references, except that the government may move for a departure or an adjustment based on the

17 defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1). Both parties agree not to

18 move for, or argue in support of, any departure from the Sentencing Guidelines, or any deviance or

19 variance from the Sentencing Guidelines under <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738

20 (2005).

21     The defendant also agrees that the application of the United States Sentencing Guidelines to his

22 case results in a reasonable sentence and that the defendant will not request that the Court apply the

23 sentencing factors under 18 U.S.C. § 3553 to arrive at a different sentence than that called for under the

24 Sentencing Guidelines' advisory guideline range as determined by the Court. The defendant

25 acknowledges that if the defendant requests or suggests in any manner a different sentence than what is

26 called for under the advisory guideline range as determined by the Court, that will be considered a

27 violation of the Plea Agreement. The government's remedies and remaining obligations in this

28 Agreement shall be as outlined in paragraph II.E, above.

PLEA AGREEMENT      10

1

## VII. WAIVERS

2

### A. Waiver of Constitutional Rights.

3        The defendant understands that by pleading guilty he is waiving the following constitutional
4   rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to
5   be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative
6   defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of
7   conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to
8   testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be
9   compelled to incriminate himself.

10

### B. Waiver of Appeal and Collateral Attack.

11        The defendant understands that the law gives the defendant a right to appeal his guilty plea,
12   conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to
13   appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not
14   exceed the statutory maximum for the offense to which he is pleading guilty. The defendant
15   understands that this waiver includes, but is not limited to, any and all constitutional and/or legal
16   challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which
17   the defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts
18   attached to this Agreement is insufficient to support the defendant's plea of guilty. The defendant
19   specifically gives up the right to appeal any order of restitution the Court may impose.

20        Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if
21   one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the
22   statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant
23   understands that these circumstances occur infrequently and that in almost all cases this Agreement
24   constitutes a complete waiver of all appellate rights.

25        In addition, regardless of the sentence the defendant receives, the defendant also gives up any
26   right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any
27   aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

28        Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

PLEA AGREEMENT                    11

1   attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of
2   the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E
3   herein.

### C.   Waiver of Attorneys' Fees and Costs.

5   The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-
6   119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the
7   investigation and prosecution of all charges in the above-captioned matter and of any related allegations
8   (including without limitation any charges to be dismissed pursuant to this Plea Agreement and any
9   charges previously dismissed).

### D.   Impact of Plea on Defendant's Immigration Status.

11   The defendant recognizes that pleading guilty may have consequences with respect to his
12   immigration status if he is not a citizen of the United States.  Under federal law, a broad range of crimes
13   are removable offenses, including offense(s) to which the defendant is pleading guilty.  The defendant
14   and his counsel have discussed the fact that the charge to which the defendant is pleading guilty is an
15   aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. §
16   1101(a)(43), and that while there may be arguments that the defendant can raise in immigration
17   proceedings to avoid or delay removal, it is virtually certain that the defendant will be removed.
18   Removal and other immigration consequences are the subject of a separate proceeding, however, and the
19   defendant understands that no one, including his attorney or the district court, can predict to a certainty
20   the effect of his conviction on his immigration status.  The defendant nevertheless affirms that he wants
21   to plead guilty regardless of any immigration consequences that his plea may entail, even if the
22   consequence is his automatic removal from the United States.

## VIII.   ENTIRE PLEA AGREEMENT

24   Other than this Plea Agreement, no agreement, understanding, promise, or condition between the
25   government and the defendant exists, nor will such agreement, understanding, promise, or condition
26   exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and
27   counsel for the United States.

28   ///

PLEA AGREEMENT                      12

## IX.    APPROVALS AND SIGNATURES

### A.    Defense Counsel.

I have read this Plea Agreement and have discussed it fully with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this Plea Agreement.

Dated:    Oct. 8, 2019

THOMAS A. JOHNSON
Attorney for Defendant

### B.    Defendant:

I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. In addition, no one has threatened or forced me in any way to enter into this Plea Agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 10-8-19

JOSEPH W. BAYLISS
Defendant

### C.    Attorney for United States:

I accept and agree to this Plea Agreement on behalf of the government.

Dated:
10/22/2019

McGREGOR W. SCOTT
United States Attorney

ANDRE M. ESPINOSA
Assistant United States Attorney

PLEA AGREEMENT                    13

1

2

3

EXHIBIT "A"
Factual Basis for Plea

## I.   **Background**

**A.   The conspirators operate a $2.5 billion Ponzi scheme causing $1 billion in loss.**

From December 2009 through January 2019, Individual 1 and Individual 2, husband and wife,

owned and operated two closely related business entities, Company S and Company D (collectively "the

Company"). During nearly all of that period, the Company operated a Ponzi scheme that defrauded

investors of approximately $1 billion through material misrepresentations and omissions related to the

offer and sale of investments designed to generate profit and trigger significant tax benefits for investors.

Between approximately 2016, and February 2019, the headquarters for the Company was located in

Benicia, California, in the Eastern District of California. Defendant, Joseph W. Bayliss, began working

for the Company in late 2013, performing tasks at the direction of Individual 1 and others.

**B.   The Company sells MSGs to generate profit and to trigger tax benefits.**

Directly and through subcontractors, the Company built mobile solar generators ("MSGs"),

consisting primarily of solar panels placed on a wheeled-trailer. Company D purported to lease those

MSGs to third parties, including negotiating lease agreements and collecting payments. Individual 1 and

others acting at his direction touted the versatility of MSGs, and claimed there was a substantial market

demand for MSGs.

The Company, through Individual 1, his co-conspirators, and others acting at their direction,

solicited money from investors to purchase MSGs. A primary claim made to investors was that the

purchase of MSGs carried favorable tax consequences in addition to a profit stream. The tax benefits

included tax credits available for investment in alternative energy sources that permitted purchaser to

claim a tax credit of up to 30% of the total investment, and permitted deductions for the depreciation of

MSGs over a 5-year period. These tax benefits were significant.

The Company structured transactions with investors to maximize the tax benefits. Among other

deals, the Company sold MSGs to limited liability companies created specifically for such transactions.

These companies were investment funds, sometimes called tax-equity funds, permitted under the federal

tax code ("Funds").

PLEA AGREEMENT                                    A-1

1

**C.     Transaction financing structure and the materiality of promised lease revenue.**

2          Through the Funds, investors purchased MSGs from Company S for $150,000 per MSG.
3  Typically, investors paid approximately $45,000 per MSG in cash—approximately 30% of the overall
4  unit price—and financed the balance with Company S.  The $45,000-per-unit price was the maximum
5  amount of the tax credit investors could claim per unit.  The transactions were structured so investors
6  could immediately claim a dollar-for-dollar tax credit for the total they paid in cash to Company S, per
7  MSG.  Investors could also claim depreciation for each MSG, for five years.  To complete the
8  transactions, the Funds delivered promissory notes to pay Company S the remaining approximately 70%
9  of the sales prices over time.  The Company promised to pay off the investors' note obligations with
10  revenues generated by the lease of MSGs by Company D to third parties.

11          Pursuant to offers pitched to investors by Individual 1, his co-conspirators, and others acting at
12  their direction, the Funds leased the MSGs purchased in each transaction to Company D, which
13  purported to lease the MSGs to third parties.  Company D was supposed to receive money from those
14  third parties through lease payments.  After deducting certain fees, Company D was to transfer the
15  majority of the lease revenue to accounts for the Funds.  The manager of the investments funds was to
16  use the lease revenue sent by Company D to pay the periodic obligations on the notes held by Company
17  S, with a small monthly profit paid to investors.[1]

18          The purported lease revenue from third parties was a material component of the transactions.
19  First, that projected lease revenue was a factor in valuing the MSGs at $150,000 per unit.  Second, the
20  lease revenue was the mechanism for the Funds to pay the remaining approximately 70% of the
21  purchase price for the MSGs.  Based on sales pitches by Individual 1, his co-conspirators, and others
22  acting at his direction, investors were primarily interested in the tax benefits offered through each
23  transaction and not actual ownership of the MSGs.  However, because the tax credits were capped at
24  30% of the value of the overall transaction, paying anything more than 30% of that value would

25

26     [1] The Company also closed a variant of these tax-equity transactions that did not include financing through
Company S.  Rather, in those sale-leaseback transactions, investors purchased MSGs outright, or relied on outside
27  financing.  In other material respects, the transactions mirrored the primary tax-equity transactions, including the
management of third-party lease contracts by Company D, availability of post-transaction tax benefits, and a
28  profit stream.  Instead of using third-party lease revenue to pay a note obligation to Company S, the purported
revenue was paid to the investor.

PLEA AGREEMENT                          A-2

1   diminish the tax benefits—*i.e.*, the investors would pay more than the value of the tax credits.  By

2   paying off the 70% balance of the purchase price through revenue generated by leases Company D

3   promised to generate from third parties, investors maximized the tax benefits without incurring more

4   debt or cost.  Failure of that mechanism after investors executed transactions would result in default on

5   the notes, collapse of the transactions, and failure of the tax credits.

6   **D.    Purportedly independent certification of the construction and operation of MSGs.**

7        Because the Company promised to lease MSGs associated with each transaction to third

8   parties—through Company D—with little direct participation from the Funds or investors, the Funds and

9   investors did not take physical possession of those MSGs.  Rather, the Company represented to the

10  Funds and investors that it built MSGs for each transaction and those MSGs operated in a manner

11  consistent with regulations governing application of the tax credits the investors sought.  The Company

12  made those representations through written Commissioning Reports, purportedly prepared by an

13  independent engineer after a multi-point inspection of each MSG in each transaction.   Individual 1, his

14  co-conspirators, and others acting at their direction caused those Commissioning Reports to include

15  materially false information and to be delivered to investors.  In some instances, investors required

16  completed Commissioning Reports as conditions for payment to support the transactions.  In other

17  instances, Individual 1 and his co-conspirators delivered the Commissioning Reports after payment to

18  lull investors to believe their MSGs existed and operated as required under the terms of the transactions.

19  **E.    Approximate investments and tax benefit totals associated with the transactions.**

20       Between at least as early as March 2011 and December 18, 2019, at least 12 investors entered

21  into transactions with the Company through approximately 34 Funds.  Some investors invested through

22  more than one Fund.  The investors, through the Funds, collectively deposited by interstate wire transfer

23  approximately $759,000,000 into bank accounts for the Funds established for the transactions.  Further,

24  several financial institutions and other investors transferred collectively $136,000,000 to the Company

25  as part of related transactions for the purchase and lease of MSGs.  In total, the Company closed

26  transactions with Funds and others involving approximately 17,000 MSGs, at approximately $2.5 billion

27  in purported value.

28

PLEA AGREEMENT                              A-3

1    Many investors have claimed tax credits and depreciation in connection with the transactions
2    premised on the revenue allegedly being generated by Company D's leases of the MSGs to third parties.
3    The tax value of the tax credits and depreciation claimed by the Funds, up to and including the 2017 tax
4    year, is approximately $902,000,000. This figure does not account for approximately $167,000,000 that
5    investors paid into tax equity transactions in 2018.

6    **F.    Operation of the "flip" deals that followed the tax equity transactions.**

7    The Company structured nearly all of the tax-equity transaction so the investors owned 99% of
8    the associated Fund and the fund manager owned 1% the Fund. After five years, the ownership
9    structure flipped, with the fund manager owning 95% of the Fund and the investors owning 5%. After
10   five years, investors had the option of selling their 5% ownership interest in the Fund to the fund
11   manager, and divesting their ownership interest in the MSGs. This appealed to many investors because,
12   after five years, they could extract no further tax benefit from ownership of the MSGs.

13   At the end of a five-year term of a tax-equity transaction, the Company would arrange to sell
14   certain existing MSGs from those transactions to buyers in "flip" deals. In one such transaction,
15   Individual 1, his co-conspirators, and others acting at their direction brokered a "flip" deal with A-Group
16   and K Bank. As part of that transaction, K Bank provided $27 million to A Group, a private equity
17   group, to finance the purchase of approximately 416 MSGs that were owned by two Funds through
18   earlier tax-equity transactions. The $27 million from K Bank represented approximately 80% of the
19   overall transaction. A Group investors contributed the balance of the purchase price. The deal was
20   completed through a special purpose entity called S-Sense.

21   Individual 1, his conspirators, and others acting at their direction represented to A Group and K
22   Bank that the 416 MSGs were leased to Telecom Company A as part of an approximately 10-year fixed
23   amount contract between Telecom Company A and Company D. After the sale, S-Sense leased the
24   MSGs back to Company D to continue leasing them to Telecom Company A as part of the purported
25   existing contract between them. Thereafter, the Company assigned purported lease revenue generated
26   by that lease with Telecom Company A to S-Sense as a revenue and profit stream.

27   **G.    The Company's tax equity transactions were fraudulent.**

28   Bank records, witness interviews, and other evidence, revealed that Individual 1 and his co-

PLEA AGREEMENT                          A-4

1    conspirators knowingly misrepresented the existence of lease revenue from third parties—an integral
2    component in all of the Company's transactions—and caused others to unwittingly do so.  In particular,
3    the conspirators claimed Company D generated tens of millions of dollars in lease revenue from third
4    parties leases, from long-term and short-term agreements with third parties.

5           In truth, Individual 1 and his co-conspirators operated the Company as a massive Ponzi scheme.
6    Over 90% of the money Company D claimed as lease revenue, and which it used to pay the Funds' note
7    obligations and other payments to investors was actually derived from transfers of cash contributed to
8    Company S by later investors in tax-equity and other transactions.  Company S had nearly no other
9    significant sources of revenue.  Company S was the primary source of income for Company D,
10   providing no less than approximately 94% of all of the purported revenue Company D claimed.  Thus,
11   the Company merely paid obligations due to older investors with money raised from those investors and
12   later investors—contrary to representations to investors made by Individual 1, his co-conspirators, and
13   those acting at their direction, that third-party lease revenue would pay those obligations.  Certain of
14   Company D's existing third-party lease agreements were supported with separate side-agreements
15   pursuant to which Company S paid investor money to third parties, which the third parties returned in
16   the form of lease revenue.  The conspirators concealed the absence of third-party lease revenue from
17   investors through, among other means, false financial statements they knowingly shared with investors.

18   **H.     The A Group/K Bank "flip" deal transaction was fraudulent.**

19          The A Group/K Bank "flip" was also a fraud.  Contrary to representation made by Individual 1,
20   his co-conspirators, and others acting at their direction, the purported fixed-term lease between Telecom
21   Company A and Company D that supported the transaction was false.  Rather, certain as-needed leases
22   with Telecom Company A generated only a fraction of the millions in annual revenue Individual 1 and
23   his co-conspirators claimed supported the A Group/K Bank deal.  The overwhelming majority of that
24   purported revenue derived from intercompany transfers of tax-equity investor money from Company S
25   to Company D.  In support of the transaction, and in furtherance of the fraud, Individual 5 knowingly
26   caused a fraudulent estoppel agreement to be delivered to A Group/K Bank in support of the transaction,
27   which purported to assign lease revenue to A Group/K Bank, when that lease agreement and the
28   purported revenue associated with it did not exist.

PLEA AGREEMENT                                A-5

## I.   The December 2018 searches and asset seizures, the Company's bankruptcy, and the MSG audit by investor-victims.

In December 2018, law enforcement agents executed federal search warrants at the Company's headquarters and other locations.  Agents also executed more than 150 asset seizure warrants, resulting the seizure of approximately $60,000,000 in assets derived from the fraud.  During execution of those warrants, agents found approximately $1.7 million in cash in Individual 1's office safe and over $150,000 in cash in other locations throughout the office suite.  Inside the chief financial executive's office, agents found investor presentations and marketing documents, as well as internal financials for Company D's performance in November 2018 and December 2018.  Agents also interviewed employees, at least one of whom provided information about the Company's structure and evidence of the ongoing fraud.

Following execution of those warrants, the Company entered bankruptcy in or about February 2019.  Thereafter, certain investor-victims financed an independent audit of the existence and location of all MSGs based on information that the Company had not built the total number of MSGs it represented to investors were part of the tax-equity transactions.  The audit produced evidence of the existence of approximately only 6,000 MSGs from approximately 17,000 MSGs associated with sales to Funds in approximately 34 tax-equity transactions.  Among others, none of the approximately 2,280 MSGs associated with Fund 29, involving over $100,000,000 in cash paid by an investor in or about May 2017, were located in the investor-victim audit.  Additionally, only approximately 83 of the 2,279 MSGs associated with Fund 33, involving more than $90,000,000 in cash paid by the same investor in or about July 2018, were located in the investor-victim audit.

## II.   Fact Supporting Defendant's Guilty Plea

### A.   Bayliss agrees to falsify Commissioning Reports to be delivered to investors.

Defendant Joseph W. Bayliss ("Bayliss") knowingly facilitated the Company's fraud.  As early as the start of 2014, Bayliss agreed with Individual 1 and other co-conspirators to complete increasingly false Commissioning Reports ("Reports") to be delivered to investor-victims.  Bayliss, Individual 1, and their co-conspirators knew the Company would deliver those false Reports to investor-victims to trigger payment of money or to lull those investor-victims to believe MSGs associated with their transactions

1 | existed and operated as required by the sales agreements. Bayliss completed thousands of Reports for

2 | MSGs associated with transactions with multiple Funds.

3 |     A significant percentage of the Reports were materially false. First, although the Reports stated

4 | otherwise, Bayliss was not a licensed engineer. Rather, he was an electrician. Nor was Bayliss

5 | independent of the Company, as stated in the Reports. Instead, he was a frequent contract employee of

6 | the Company, through his firm, Bayliss Innovative Services, Inc. ("BIS"). Through BIS, Bayliss

7 | performed regular work for the Company at the direction of Individual 1 and others, from approximately

8 | the end of 2013 and December 2018. More significantly, the false Reports also certified that Bayliss

9 | inspected and tested approximately 20 components and operational functions of the MSGs. In fact, at

10 | the direction of Individual 1 and their co-conspirators, for approximately two years between 2016 and

11 | 2018 Bayliss completed thousands of Reports for MSGs that were not located in the investor-victim

12 | audit because they were never built.

13 |     Initially, in 2014, Bayliss completed certain Reports after inspecting the associated MSGs.

14 | However, in late 2014 and in 2015, Individual 1 asked Bayliss to complete Reports he claimed others

15 | had inspected. Bayliss did not think those others were qualified to perform the inspections but he signed

16 | the Reports anyway. Over time, Bayliss began to complete Reports for MSGs he intended to inspect

17 | later but only sometimes inspected. In late 2015 and early 2016, Bayliss learned from Individual 5 that

18 | MSGs for which he had completed Reports had not been built. Bayliss confronted Individual 1, who

19 | persuaded Bayliss to continue to complete false Reports. Individual 1 assured Bayliss the Company

20 | would catch up, and urged Bayliss not to "overthink it." During the approximately two years before the

21 | December 2018 searches, Bayliss knew he was completing Reports for MSGs that had not been built.

22 |     In spring 2018, Bayliss discussed the false Reports with Individual 1, Individual 2, and

23 | Individual 5. He had multiple conversations with Individual 1 about the subject. In a conversation

24 | during that period with Individual 1 and Individual 2, Bayliss discussed an "exit strategy" from the false

25 | Reports the Company had delivered to investors. Individual 1 discussed a plan to conceal the non-

26 | existent MSGs through buying them back after the tax-equity transactions ended and selling the parts in

27 | false "paper" transactions. In a discussion with Individual 1 and Individual 2, Bayliss discussed how the

28 | Company would sneak missing MSGs into service if they were built. After Individual 2 could not offer

PLEA AGREEMENT             A-7

1  an explanation, Bayliss became sure the missing MSGs would never be built.  In October 2018,
2  Individual 1 and Individual 2 discussed with Bayliss their interest in buying citizenship in another
3  country from which they could not be extradited.  Individual 1 spoke to Bayliss about extradition on
4  other occasions, however, after the December 2018 searches, Individual 1 told Bayliss he would not flee
5  and would stay and "face the music."

6      Individual 1 paid Bayliss to complete the false Reports, initially $10,000 per tranche and later
7  $15,000 per tranche.  After Bayliss confronted Individual 1 about certifying non-existent MSGs,
8  Individual 1 told Bayliss he could not pay Bayliss more at that time.  Eventually, Individual 1 and
9  Individual 2 asked Bayliss to submit invoices for certain unfinished and future work Bayliss planned to
10 complete for the Company, and paid Bayliss approximately $1,000,000 on those invoices and otherwise.

11      Among other specific overt acts undertaken by Bayliss in furtherance of the conspiracy, on or
12 about June 27, 2017, Bayliss completed and signed certain Reports for MSGs associated with Fund 30,
13 which involved approximately 1,326 MSGs, for which the investor paid approximately $60,000,000.
14 None of the MSGs associated with the Fund 30 transaction were recovered during the investor-victim
15 audit.

16      **B.      Bayliss assists Individual 1 to conceal non-existent MSGs from investor inspections.**

17      In spring 2017 or 2018, a day before an investor inspection of MSGs in Benicia, Bayliss
18 observed Individual 1 and others replacing original VIN stickers on MSGs with new VIN stickers
19 bearing different numbers.  Individual 1 told Bayliss the VIN sticker replacement was required because
20 the Company was behind on producing all of the MSGs they had sold.  Bayliss understood Individual 1
21 to mean the VIN sticker replacement was necessary to conceal from the investor that the MSGs in its
22 transaction had already been sold in a past transaction.

23      Bayliss assisted Individual 1 in replacing VIN stickers on MSGs before investor inspections on
24 at least two occasions.  First, in Las Vegas in advance of an inspection performed by an independent
25 engineer from Pennsylvania.  Second, at the end of summer 2018, Bayliss helped Individual 1 replace
26 VIN stickers on approximately 200 MSGs in advance of an investor inspection at a Company location in
27 Nevada.  In that instance, Bayliss and Individual 1 bought scrapers and acetone at a home repair store to
28 facilitate the VIN sticker replacement effort.  That inspection did not happen.

PLEA AGREEMENT                          A-8

**C.     Bayliss destroys evidence at Individual 1's direction after the 2018 searches.**

A night or two after the December 2018 law enforcement searches, Individual 1 asked Bayliss to meet him in the parking lot of a restaurant in Martinez.  Bayliss agreed.  Individual 1 and Individual 2 were present.  Individual 1 suggested he would set aside $200,000 to cover Bayliss's legal fees.  Individual 2 objected.  Individual 1 then instructed Bayliss to obtain a "burner" phone and travel to a Company warehouse in Nevada to destroy evidence.  Individual 1 instructed Bayliss to go to the facility to find and destroy a collection of replacement VIN stickers.  Individual 1 also asked Bayliss to scrape off replacement VIN numbers from approximately 200 MSGs in the warehouse.  Bayliss agreed.  In addition to the stickers he removed from MSGs, Bayliss found and destroyed at least 1,000 replacement VIN stickers that were stored in boxes at the warehouse.  Bayliss believed the law enforcement searches were related to the Company's failure to build MSGs and delivery of false Reports to investors.  Bayliss knew Individual 1 and their co-conspirators were stealing from investors.

**D.     Bayliss's conduct and that of his co-conspirators caused interstate wires.**

Bayliss agrees his conduct and that of his co-conspirators, as set forth above, caused interstate Fedwire deposits of money from the investor-victim in the Fund 30 transaction, P Company, based in Ohio, to bank accounts in California controlled by the Company, among others, as set forth below:

| Company Bank | Account No. | Date | Deposit Amount | Payor |
|---|---|---|---|---|
| H Bank | 5773XXX | 5/17/2017 | $15,063,692 | P Company |
| H Bank | 5773XXX | 7/20/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/24/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/29/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 9/25/2017 | $10,224,225 | P Company |

*I have read and carefully reviewed the Factual Basis for Plea with my attorney.  I agree that as it concerns my conduct it is correct.  I also agree that if this matter proceeded to trial, the United States could establish each of the facts contained within the Factual Basis for Plea beyond a reasonable doubt, and that those facts satisfy the elements of the offense to which I am pleading guilty.*

Dated: _____

_____
JOSEPH W. BAYLISS
Defendant

PLEA AGREEMENT                                    A-9